UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DEANNA M. LEONE, Individually and as
Administratrix of the Estate of Todd J. Leone,
deceased,

                  Plaintiff,                        5:06-CV-0389
                                                    (NAM/GJD

      vs

CSX TRANSPORTATION, INC. and CSX
CORPORATION,[1]

                  Defendant.
_____

| **APPEARANCES** | **OF COUNSEL:** |
|---|---|
| RIEHLMAN SHAFER AND SHAFER | Jane G. Kupperman, Esq. |
| P.O. Box 430 | |
| 397 Route 281 | |
| Tully, New York  13159-0430 | |
| *Attorneys for Plaintiff* | |
| | |
| HODGSON RUSS, L.L.P. | Lawrence R. Bailey, Jr. |
| 60 East 42nd Street | |
| New York, New York  10165 | |
| *Attorneys for Defendants* | |

**Norman A. Mordue, Chief U.S. District Judge**:

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

After drinking for nearly four hours at a bar/strip club in East Syracuse, New York,

plaintiff's decedent husband walked on or near the railroad tracks directly behind the Syracuse

China Factory on Court Street in the Town of Salina and was subsequently struck and killed by a

---

[1]

    Plaintiff stipulated to dismissal of National Railroad Passenger Corporation/Amtrak which
was originally named as a defendant in this case in July 2006.

westbound CSX train.  Plaintiff commenced the instant litigation in New York State court alleging that defendants' negligence was the cause of her husband's death.  Specifically, plaintiff alleged that the CSX crew failed to keep a proper lookout, failed to keep the train under proper control, failed to give sufficient warning of the train's approach, and that CSX failed to maintain proper signs, warnings and fences to keep persons away from dangerous areas on the property.  Defendants removed the action to this Court in March 2006.  Defendants have moved for summary judgment on the ground that there is no evidence that it was negligent in causing or contributing to decedent Leone's death.  Plaintiff opposes defendants' motion.[2]

## II.    FACTUAL BACKGROUND

The relevant facts in this case are as follows: On the date of his death, plaintiff 's decedent husband, Todd Leone, was 32 years old.  He was employed by Production Products Company ("PPC") in East Syracuse and punched out of work on the date of the accident at 5:37 p.m..  Sometime after 6:00 p.m., Leone arrived at Diamond Dolls, a bar/strip club on Town Line Road in the Town of Salina.  Leone remained at Diamond Dolls until at least 10:00 p.m..  There are no known eyewitnesses who observed Leone leave the bar or gain access to the railroad tracks in the vicinity of Diamond Dolls.  However at approximately 10:55 p.m., the engineer and conductor of a CSX train observed an "obstruction" on Track #1 as they operated the train headed westbound toward Chicago.  Seconds later, the CSX operators realized that the obstruction was a person and

---

[2]
    Defense counsel notes in his reply papers that plaintiff has not expressly opposed that portion of defendants' motion which seeks: 1) dismissal of the entire complaint against CSX Corporation on the ground that it is merely a holding company for defendant CSX Transportation, Inc.; 2) dismissal of plaintiff's claim for punitive damages.  Given plaintiff's failure to advance factual or legal arguments concerning these aspects of defendants' motion, the Court will grant judgment in favor of CSX Corporation and dismiss the punitive damages claim against defendant CSX Transportation, Inc.

attempted to stop the train to no avail.  At the time the CSX train struck him, Leone was lying

motionless and face up next to Track #1 with one or both of his legs draped over the rail.  The

CSX operators notified emergency services  immediately of the accident.  Leone was pronounced

dead at the scene after suffering partial amputation of his left leg, massive head trauma and other

serious injuries.

The accident was subsequently investigated by the Onondaga County Sheriff's

Department which concluded that Leone's death was accidental.  The report of Detective D. R.

Fahey, which is affirmed under penalty of perjury, indicates that the area where Leone was struck

by the train is an "unlit area directly behind the Syracuse China Factory located on Court Street in

the Town of Salina."  According to Fahey, in this area, there are four sets of railroad tracks.

Fahey determined that Leone was struck as he lay partially on the second set of tracks - known as

"Track #1" by a CSX locomotive.

The police investigation of the incident included interviews with the involved CSX

personnel.  James Fulater, the CSX engineeer who was operating the train at the time of the

accident told the Sheriff's investigator that the train was traveling at approximately 50 m.p.h.

when he and the conductor, Richard Hayes, "approached a curve" and observed an obstruction on

Track #1 approximately one quarter of a mile ahead.[3]  Fulater testified that the "minute [he] saw

---

[3]

In his deposition on January 11, 2007, Fulater testified that when he first observed the
obstruction, it was at a distance of about a "quarter of a mile."  On the errata sheet which he
signed on April 26, 2007, there were three type-written changes made to portions of his
testimony.  Below Fulater's signature and the certification of the notary who witnessed his
signature, there are three additional hand-written notations concerning his testimony.  One of the
notes indicates that at page 49, line 20 where Fulater stated "I would guess about a quarter of a
mile" in response to the question of when he first saw the obstruction on the tracks, the transcript
should read "about 200-300 feet."  Plaintiff's counsel object's to Mr. Fulater's apparently
untimely attempt to alter his sworn testimony in violation of Rule 30(e) of the Fed. R. Civ. P..

the object, [he] blew [his] horn."  According to Fulater, once the horn was engaged, the bell on the train was also automatically activated and the train's ditch lights would begin to flash.  Fulater said that the "only illumination" of the railroad tracks in the area where the accident occurred was the train's headlight two ditch lights.  Fulater did not immediately recognize that the obstruction on the track was a person, but when he was a "couple of hundred feet" from the "object," he "saw sneakers" and then "realized there was [sic] legs attached to them but there was no movement."  Fulater said that Hayes recognized a person was laying on the track before he did because at the same time that Fulater was realizing that the obstruction was a body, he heard his conductor say "dump it" which meant to "put the train in an emergency."

Richard Hayes told Detective Fahey that he and Fulater were operating the train on Track #1 at "approximately 30 m.p.h.."  "[S]omewhere in the vicinity of mile marker QC289.0, [he] saw a body lying between tracks #1 and #2."  According to Hayes, the body "appeared to have . . . its legs lying across the rail of track #1."  "As soon as [Hayes] saw the body, [Fulater] engaged the train's emergency brakes to stop the train."  Hayes estimated that "it took about 45 seconds" to stop the train.   Prior to the collision, Hayes stated that he "did not see the body move at all." At his deposition, Hayes testified that he had been "looking forward" or "watching out the front of the train" since it left Albany at around 7:30 p.m..  Just before the accident, the train approached a curve when the headlight "picked up" an "obstruction" on the track ahead.  Hayes estimated at that time he saw something on the track that the train was "about 300 feet" from the obstruction.  Hayes said that he "immediately" recognized the object on the track was a person and told the engineer to "dump" the train or activate the emergency brakes.

---

However, defense counsel concedes that for the purpose of the present motion, the Court should assume the distance Fulater first viewed an obstruction on the track was one quarter of a mile.

4

Upon interviewing witnesses in connection with his investigation, Detective Fahey learned that Todd Leone did not own a car, that he often walked, rode a bicycle or got a ride to work, and that he frequently went to Diamond Dolls after his shift at PPC.  A coworker of Leone's told Fahey that Leone said he had "friends" at Diamond Dolls who "[didn't] charge him anything."  Fahey interviewed Leone's friend, Shane Kingsberry, who said Leone called him on the night of the accident from Diamond Dolls and asked him to "come over" for a "few drinks," but Kingsberry declined.  Kingsberry did tell Fahey, however, that Leone had a "severe drinking problem," that Leone drank "excessively" and was known to drink "so much that he [would] pass out."

Fahey also interviewed Shannon Lewis, a friend of Todd Leone's who said that in July 2003, Leone told her that to get back and forth to his job at PPC he "was used to walking the railroad tracks" since he had done so "as a kid."  Lewis told Leone that "it was dangerous to walk the railroad tracks" and that he "should find some other means of walking to getting home." Lewis told Fahey that Leone "brushed off" her concerns and said "it was not at all dangerous to walk the railroad tracks as he had done it for years and nothing had ever happened to him."  In her deposition, Lewis testified that Leone told her that taking the railroad tracks was a "shortcut way to go home."  Lewis said she was "shocked" by his statement and told him "don't ever do it again."  Lewis testified that Leone then said "You're right."  Lewis told Leone that he could get caught for trespassing and that he should call her anytime of day for a ride in lieu of walking the tracks.

A toxicologist employed by the Onondaga County Medical Examiner's Office who analyzed a blood sample taken from Todd Leone determined in a sworn report that Leone's blood alcohol level at the time of his death was 0.22 g%.  Detective Fahey affirmed in his report that the

5

Medical Examiner had been unable to determine whether Leone was conscious or unconscious at the time of the collision.  However, in concluding that Leone's death was accidental, it appears that Detective Fahey assumed from his investigation that Leone was lying unconscious with his left leg on Track #1 at the time of the accident.  Indeed, neither Fulater nor Hayes had observed any movement of Leone's body prior to impact with the train.

In reaching his conclusions concerning how the accident happened, Detective Fahey returned to the scene of the collision and walked in an easterly direction from the point of impact. In a period of ten minutes, Detective Fahey affirmed that he arrived at an area of the tracks "directly behind the old GM plant on GM Circle."  Fahey further observed "[s]tanding on the railroad tracks behind the GM plant, you are able to look north and see Diamond Dolls on Townline Road.  It is conceivable that this would be a direct route for the victim to take."  Fahey also noted that "if the victim was walking westbound along the tracks, the rise from the second set of tracks (the one that he was lying upon) from the first set is approximately eight to ten inches. Given that this is a dark area, it is possible that he was unable to see the difference in the elevation of the tracks."

Upon completion of his investigation Detective Fahey opined as follows:

> It is the conclusion of this writer that upon completion of work at PPC the victim did, in fact, walk to Diamond Dolls where he stayed until somewhere around 10:00 p.m. at which point he walked from Diamond Dolls to the old GM plant on GM Circle.  From there he walked behind the plant walking westbound along the railroad tracks, at some point behind the Syracuse China Factory attempting to cross the tracks heading southbound, stumbling across Track #1 and falling southwards to Track #2 with his left leg still on Track #1.  There he laid unconscious and was struck by the westbound train.  The victim's unconsciousness could be due, in part, to his high blood alcohol content along with him falling to the ground.  It is also the conclusion of this writer that the engineer and conductor of the train did everything possible to avoid this accident.  The victim's death is

6

considered accidental.

Defendants have moved for summary adjudication of plaintiff's claims asserting that there is no evidence that negligence on the part of CSX or any of its employees caused or contributed to Todd Leone's death.  Indeed, defendants argue that the plaintiff alone was responsible for his apparent intoxication, reckless behavior and decision to trespass on railroad property, all of which led to his death.  Plaintiff counters that there is material question of fact whether the CSX engineer, Mr. Fulater, "in the exercise of reasonable care, should have properly perceived the 'obstruction' that was Todd Leone and taken appropriate action sooner."  Plaintiff argues that had Fulater taken steps to immediately stop or slow the train upon seeing the obstruction, he might have avoided the accident or greatly reduced the injuries sustained by Leone.  Plaintiff contends that it was negligent of Fulater to wait to take any action to stop the train until after he realized it was a pedestrian laying on the track ahead.  Plaintiff also claims that it was negligent of CSX to have not erected fencing in the area where the accident occurred or "No trespassing" signs which would have prevented people from entering railroad property.  Plaintiff claims that CSX had a duty to warn trespassers and prevent access since train/pedestrian accidents had occurred in the area previously.

**III.    DISCUSSION**

A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in

dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.

Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. 1985).  It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

B.     Relevant Legal Standard

New York courts have a long history of determining the liability of railroad companies for the often tragic and inevitable meetings between pedestrians and moving trains.  In *Chrystal v. Troy & B.R. Co.*, 105 N.Y. 164 (1887), the New York Court of Appeals summarized the responsibility of the defendant's engineer, unable to stop a train prior to hitting a toddler who had wandered onto the tracks, as follows:

> An engineer is not bound to stop his train the moment he sees some living object upon the track. He has the right, in broad daylight, when his train is perfectly visible and its approach must be heard and known, at least in the first instance, to assume that the object, whatever it is, will leave the track in time to escape injury. He is not bound to expect helpless infants upon the track without sufficient knowledge or ability to escape when warned of danger. He could not know when he first saw the plaintiff that he was too young to be conscious of the danger to which he was exposed, and without the imputation of negligence he could run on until he discovered that he was heedless of the danger. Reasonable care in the management of

8

> trains which must make their time between stations, and have the right of way, does not require more.
>
> The defendant is not responsible for any error of judgment, if there was any, on the part of the engineer as to the speed of his train, the distance, age and peril of the child, and his ability to stop the train in time protect him. All the engineer was bound to do after the discovery of the peril was to use reasonable diligence and care to avert it.

105 N.Y. at 170.  Insofar as assessing the defendant engineer's reasonable diligence, the Court of Appeals determined:

> [W]e are of opinion that the evidence failed to show any negligence on the part of the defendant. There is no charge that its road bed or engine, or any of the appliances upon its train were out of repair, defective or insufficient. Nor is there any claim that there was any omission to give the proper signals for this crossing, or that the train was run at an improper rate of speed. The sole negligence charged, as we understand it, is that the engineer ought sooner to have discovered the plaintiff upon the track, and stopped the train before it reached him.

*Chrystal,* 105 N.Y. at 168.

In *Andrews v. Metro North Commuter R. Co.,* 882 F.2d 705, 709 (2d Cir. 1989), the defendant's locomotive engineer testified that, when he saw the plaintiff, later discovered to be intoxicated, walking towards him in the railway track, he made a service application of the brakes and started blowing the horn.  As soon as the engineer saw that the plaintiff  was not leaving the track, he put the train into emergency.  In proceeding in this manner, the Circuit noted that the engineer was acting "in accordance with a widely accepted doctrine of railroad law, viz., that, absent knowledge of some disability on the part of a mature pedestrian seen on or near the tracks, a locomotive engineer who gives a proper alarm is entitled to assume that the pedestrian will heed the warning and move to a place of safety." *Andrews*, 882 F.2d at 709 (citing *Box v. South Georgia Ry.*, 433 F.2d 89, 92-93 (5th Cir. 1970); *Cagle v. Norfolk Southern Ry.*, 242 F.2d 405,

9

407-08 (4th Cir. 1957); *Kowaleski v. Pennsylvania R.R.*, 103 F.2d 827, 830 (3d Cir.), *cert. denied*, 308 U.S. 556 (1939); 75 C.J.S. Railroads § 915; *see Ives v. New York, N.H. & H. R.R.*, 138 Conn. 471, 474 (1952); *Dyson v. New York and New England R.R.*, 57 Conn. 9, 23, 17 A. 137 (1888)). According to the Second Circuit, "this well-settled rule not only is a common-sense recognition of how people act, it also takes into account the danger to passengers and crew inherent in emergency brake applications on rapidly moving trains."  *Id.* at 210 (citing *e.g., New York, N.H. & H. R.R. v. Henagan*, 364 U.S. 441 (1960); *Grogg v. Missouri Pacific R.R.*, 841 F.2d 210, 213 (8th Cir. 1988); *Rogers v. Elgin, Joliet & Eastern Ry.*, 248 F.2d 710, 711 (7th Cir. 1957)). Whatever duty defendants' engineer may have owed the plaintiff in *Andrews,* the court held "it is beyond dispute that he owed his passengers the highest degree of care."  882 F.2d at 710 (citing *Southern Ry. v. Hussey*, 42 F.2d 70, 71 (8th Cir. 1930), *aff'd,* 283 U.S. 136 (1931)). "Indiscriminate use of emergency braking procedures is not consistent with the performance of this duty."  *Id.* (citing *Fierro v. New York Central R.R.*, 256 N.Y. 446, 450 (1931)).

The "widely accepted" doctrine of railroad law discussed in *Andrews* is embodied in New York's Pattern Jury Instructions which provide "[i]n a case in which the train is on an 'open run' between stations or stops," to "insert the following paragraph:"

> In deciding whether the railroad exercised due care, you should bear in mind that a train engineer who sees a person on or near the track in broad daylight is not bound to stop the train immediately, but has the right to assume that the person will see and hear the train, heed the danger, and leave the track. In such a situation, the engineer has no duty to make an emergency stop until he or she determines that the person cannot or will not leave the area on the track.

NY PJI 2:176.  Thus, in New York, it is long-settled that a train operator may only be found negligent if he or she sees a person on the tracks "from such a distance and under such other circumstances as to permit him [or her], in the exercise of reasonable care, to stop before striking

the person." *Coleman v. New York City Tr. Auth.*, 37 N.Y.2d 137, 140 (1975); *see also*

*Noseworthy v. City of New York*, 298 N.Y. 76, 79 (1948); *Soto v. New York City Transit Auth.*, 6

N.Y.3d 487, 493 (2006).  A defendant rail company may meet its initial burden on a motion for

summary judgment dismissing the complaint by submitting evidence sufficient to demonstrate,

*prima facie*, that the train operator could not have stopped the train in time to avoid the accident.

*See Stanley v. New York City Transit Auth.*, 45 A.D.3d 832, 833 (N.Y. 2 Dept. 2007) (citing

*Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 (1986); *Reeve v. Long Is. R.R.*, 27 A.D.3d 636,

637 (N.Y. 4th Dep't 1996)).

C.     Plaintiff's Substantive Claims

In presenting or opposing a *prima facie* case of negligence, "[e]ither party may submit as

evidence 'pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits' to support or rebut a summary judgment motion."  *Barlow v. Connecticut*, 319

F.Supp.2d 250, 260 (D.Conn. 2004); *see also* Fed. R. Civ. P. 56(e) ("Supporting and opposing

affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible

in evidence, and shall show affirmatively that the affiant is competent to testify to the matters

stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit

shall be attached thereto or served therewith.")  "Unsworn statements, letters addressed to

litigants, and affidavits composed of hearsay and non-expert opinion evidence do not satisfy Rule

56(e) and must be disregarded."  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, n. 17

(1970).

The task of assessing the evidence in this case is complicated by the submission of a great

deal of material on both sides which is not in evidentiary form.  For example, defendants rely on

the expert opinion of Dr. Robert Forney, Ph.D., a forensic toxicologist, who concluded after

reviewing police reports and the report of the autopsy performed on Todd Leone, that at the time

of the accident, Leone was intoxicated.  Forney concluded that as a result of the alcohol in his

system, Leone's perception, judgment, reaction, balance and coordination was impaired.

Moreover, Forney opined that Leone was more "drowsy and sedated" based on his intoxication

than he would have been without the alcohol in his system.  However, the Court notes that Mr.

Forney's opinion, in the form of an unsworn letter to defense counsel, is not in compliance with

the evidentiary standard of Fed. R. Civ. P. 56(e).

To a large extent this deficiency is of no moment since defendants have also submitted the

sworn report of toxicologist Jeffery Hackett from the Onondaga County Medical Examiner's

Office.  Hackett avers that Leone's blood alcohol content was .22 g% which the Court notes is

more than two and a half times the limit for legal "intoxication" in the State of New York.  *See*

N.Y. Veh. & Traf. Law § 1192 (a person is driving while intoxicated "per se" if he or she has a

blood alcohol content of .08% or more).[4]  Defendants also rely on Detective Fahey's sworn

investigative report which includes evidence that: 1) Leone had been at a bar for at least three and

a half hours prior to the accident; 2) he had been drinking and he was described by a person with

knowledge of his drinking habits to drink to "excess" and to the point of "passing out;" and 3) by

all accounts Leone was unconscious and/or motionless while laying across the railroad tracks at

the time of the accident.  Notably, plaintiff has submitted no evidence to rebut any of the above-

referenced facts established by defendants' submissions.  Based on the above, the Court finds that

---

[4]

It is also illegal in the State of New York to: 1) hunt with a blood alcohol content of .10% or higher (see N.Y. Envtl. Conserv. Law § 11-1201); 2) operate a boat with a blood alcohol content of .05% or higher (see N.Y. Nav. Law § 49-a); or operate a snowmobile with a blood alcohol content of .05% or higher (see N.Y. Parks Rec. & Hist. Preserv. Law § 25-24).

Leone was intoxicated at the time of the accident.

Defendants rely on the testimony of Messrs. Fulater and Hayes concerning how the accident occurred in arguing that it was not preventable.  Portions of the deposition testimony of both men are attached to the parties' moving papers.  In addition, both Fulater and Hayes gave statements to the police which were sworn to under penalty of perjury.  Mr. Fulater told police and later testified that when he first saw an obstruction on the track ahead, he did not realize it was a person, but he did recall sounding the locomotive's warning horn/bell.  Upon seeing the obstruction on the track Fulater testified that he was "concentrating very hard on what[he] was seeing."  Fulater said that he was "a couple of hundred feet" from Leone when he "saw sneakers" and realized a human being was laying on the tracks motionless.  Fulater acknowledged that his conductor recognized that the obstruction was a person before he did and yelled for him to put the train into emergency.

Mr. Hayes testified that he was looking ahead continuously from the time the train left the station in Albany to when the accident occurred.  Moments before the collision, the train approached a curve and the headlight "picked up" an obstruction on the track ahead.  Hayes testified that they were "about three hundred feet" from the obstruction when he immediately realized it was a person and told Fulater to "dump" the train.  At no time prior to the collision did Hayes see Leone's body move.

In their moving papers, defendants also submitted the expert report of Foster Peterson, a mechanical engineer with 15 years of experience in the railroad industry, who conducted analysis of the event data downloaded from the equivalent of the locomotive's "black boxes" in this case.  While Peterson's report is unsworn and unverified, he submitted a reply affidavit in this case which incorporates and "better explain[s]" the conclusions in the report.  Peterson also gave a deposition in this case wherein he discussed various aspects of his expert report.  Portions of said

sworn affidavit are attached to plaintiff's opposition papers.  Peterson stated that the locomotive

at issue was "pulling 28 loaded and 81 empty freight cars with a trailing tonnage of 6,374 tons

and a total length of 10,205 feet."  Peterson assumed from the testimony of Fulater and Hayes that

the farthest the train was from Leone when the engineer and conductor first observed Leone's

body on the track was a quarter of a mile.  According to Peterson, one quarter mile is 1,320 feet.

Based on his review of the event data recovered from the locomotive in this case, Peterson

concluded that the train was traveling at 32 m.p.h., or 46.93 feet per second when the emergency

brake was activated.[5]  The information Peterson obtained from the event data recorders on the

train indicated that it took 1,238 feet to stop the train after emergency application of the brakes.

Thus, in order to have avoided hitting Leone, the crew had 82 feet or approximately 1.7 seconds

to perceive and react upon first observing an obstruction on the track.  In this case, however, the

crew sounded the horn 4 to 5 seconds or approximately 225 feet prior to the accident and placed

the train's brakes into emergency 0.8 seconds or approximately 28 feet before impacting Mr.

Leone.  According to Peterson, various factors, including the darkness, the track curvature, the

fact that Leone was laying down on the tracks and his location which was not near a rail/highway

grade crossing where it would be more common to observe vehicles or pedestrian trespassers,

likely increased the time for the crew in this case to perceive and react to Leone's unexpected

presence on the track.  Mr. Peterson opined that based on the evidence he reviewed in this case,

even if the crew had a duty to brake upon observing an obstruction on the track at 1,320 feet, it

would have taken longer than 1.7 seconds for the engineer to react and actually activate the

---

[5]

    The memorandum of law submitted by defendants argues that the legal speed limit for
freight trains on the track where the accident occurred is 60 m.p.h. and that CSX's own internal
rules imposed a maximum allowable speed limit of 50 m.p.h. for this portion of the track.
However, these facts have not been presented to the Court in evidentiary form by a person with
personal knowledge.

emergency brakes to prevent the collision.  Thus, according to Mr. Peterson, the train crew could not have avoided this accident.

Defendants also submitted a reply affidavit from Marc Fredette, a locomotive engineer and Road Foreman of Engines employed by CSX.  Mr. Fredette also testified at a deposition in this case and portions of his deposition testimony were presented by both parties.  According to Mr. Fredette, there are many obstructions or objects seen by engineers operating a locomotive on railroad tracks such as garbage, debris or "other matter" and it would be "absurd" to assume in each case that the obstruction is a human being.  As a further matter, Fredette averred that a human being can "use his senses to walk away from railroad tracks in a quicker fashion than the train can in coming to a stop to avoid a collision."  Moreover, according to Fredette, there are a number of safety considerations which engineers must account for in deciding to activate a freight train's emergency brakes such as the potential for a derailment or "hazmat" release.  Consequently, it is a "serious thing to put the train in emergency" and it should only be done when a engineer "know[s] for a fact" it is required and "deems it necessary."

In summary, with respect to the question of whether the train crew might have stopped the locomotive in time to avoid the accident, defendants presented proof that: 1) Todd Leone was intoxicated and lying motionless, presumably unconscious, on the railroad tracks prior to the accident; 2) Fulater blew the train's warning horn/bell after observing an object on the rail ahead and Leone either did not or could not move at any time prior to the collision; 3) it was unforseeable that a person would be laying down on the tracks and unable to remove himself from danger in the area where the accident occurred; 4) it is not standard, safe or advisable procedure for a railroad crew to activate a train's emergency brakes upon seeing an unidentified obstruction on the tracks; 5) Fulater and Hayes did not realize that there was a human being laying on the tracks ahead until they were at most "a couple of hundred feet" from Leone at which point they

could not have stopped the train in time to avoid the accident; 6) it would not have been possible for the crew to avoid the accident without applying the emergency brake within two seconds of first observing the unidentified obstruction; and 7) there were a number of factors which contributed to the delayed perception/reaction time of the crew in this case including the lack of illumination, the curvature of the track, the location of the accident and the fact that Leone was laying down on the tracks.  Defense counsel also submitted proof in the form of letters from the New York State Department of Transportation in opposition to plaintiff's claim that the railroad was additionally negligent for failing to erect warning signs and fencing to prevent trespassers from entering the railroad right-of-way.  However, these letters may not be considered by the Court as they are not in admissible form.

In opposition to defendants' proof, plaintiff has not - in the first instance - submitted evidence which raises a material question on the proof presented by defendants concerning the position of Todd Leone's body on the tracks or his presumed state of unconsciousness at the time of the accident.  Plaintiff did submit the report of her civil engineering expert, Brett Rekola, however, in an attempt to show that this accident could have been prevented or might not have been fatal had CSX or its crew acted appropriately.  Assuming without deciding presently that Mr. Rekola is qualified to render expert opinions concerning the alleged negligence of the defendant rail company, his report is in the form of an unsworn letter to plaintiff's counsel and is not compliant with the evidentiary standard of Fed. R. Civ. P. 56(e).

The Court has credited those portions of Mr. Rekola's deposition testimony that were submitted by both plaintiff and defendants in this case in which he discussed various aspects of his expert report including his opinion that "[i]t was reasonably foreseeable by the railroad and Engineer Fulater that pedestrians would be in the area of the tracks at this location and the debris on the track might be a person."  Among other things, Mr. Rekola testified that under CSX's

"own training philosophy" and under "Rule S" of "the NORAC rules,"[6] which require railway engineers to "follow a safe course," a locomotive crew should "assume" that debris observed on a track ahead is or could be a person.  However, nowhere in Rekola's testimony or his unsworn report does he elaborate on the "training philosophy" advanced by CSX which would have compelled the crew in this case to take additional or different action to avoid the accident. Further, Mr. Rekola's opinion that Fulater should have assumed that what he saw on the tracks was a person is conclusory and unsupported by any factual or legal averment.  Plaintiff has presented no evidence which demonstrates that Fulater or Hayes ignored or failed to heed indications that the obstruction they saw on the tracks was a person.

According to Rekola, Mr. Fulater also violated "Rule D" of the NORAC Rules as well by not "devot[ing] himself exclusively to company service."  Rekola stated that in accordance with Rule S and Rule D which "interlink," Fulater should have reduced the speed of the train the moment he observed an obstruction on the tracks:

> [I]f they had just instead of -- put the train into emergency but reduced the speed, then from a physics perspective you would have the impact of two objects: one that's very small and one that's very large could be at an extremely reduced rate of speed.  So I couldn't tell based on physics, you know, maybe Mr. Leone might have survived the incident and just had his leg amputated or other secondary parts.

However, nowhere in Rekola's testimony, or in his unsworn report, or in the entire record for that matter, is there any evidence which suggests, much less establishes, that the CSX train was traveling in excess of the established speed limit on the track or at an unsafe rate of speed for the conditions which existed at the time of the accident.  Further, there is no factual support in the

---

[6]

Rekola's unsworn report indicates that NORAC refers to the "Northeast Operating Rules Advisory Committee."  However the rules are not in the record nor is there any indication of whether and how the rules were applicable to defendant CSX in this case.

record for plaintiff's counsel's argument that had Fulater activated the emergency brake upon first

observing an obstruction on the track ahead that the accident might have been avoided altogether.

Indeed, nowhere in Mr. Rekola's testimony or unsworn report does he even attempt to argue that

the engineer had an obligation to engage the emergency brake upon seeing an unidentified object

on the track.  As for the contention that Fulater was obligated to slow the train before realizing

that the obstruction was a person that could or would not leave the tracks, plaintiff offers no

statute, regulation or even a railroad policy or procedure which requires a train engineer to reduce

his or her speed upon seeing an unidentified obstruction on the tracks.  Moreover, there is

absolutely no factual or scientific basis for Rekola's conclusory assertion that based on "physics"

Leone might have been merely injured by the train rather than killed had the train crew reduced

its speed upon seeing his body on the tracks.

Rekola also answered "Yes," when asked whether it was "reasonably foreseeable . . . that

a person would be drunk and laying across the railroad tracks in a passed-out condition . . . at any

location" along the rails.  Rekola testified that this answer was based in part on his experience on

the railway in Massachusetts between Boston and Framingham where "every winter they would

kill college students trying out their new cross-country skis on the railroad."  Rekola said that the

railroad track in this area was "adjacent to Boston University" although he "[did]n't know if

people were drunk."  According to Rekola:

> People knew in the terminal area that if it snowed and there was fresh
> snow and it was a Friday or Saturday night that the local switching
> terminal crew, yard crew, train master, myself would be aware that
> there were young, vibrant college students out shushing up and down
> the tracks. So there was a heightened state whenever it snowed on the
> weekend in back of BU so we wouldn't run any more of them over.

Notably, however, Rekola was "not . . . aware" of "there being a history of the railroad running

over drunk people laying in the middle of railroad tracks behind . . . the Syracuse China Factory."

The Court finds Mr. Rekola's conclusions regarding the railroad's obligation to anticipate intoxicated persons will pass out on its tracks based on his previous experience with college students in Boston to be unsupported and speculative at best.

Indeed, in opposing defendants' motion, plaintiff has failed to raise triable questions concerning the reasonableness of the actions or inactions of Fulater and Hayes on the night of the accident.  Plaintiff's counsel contends in wholly speculative terms that since Fulater testified that he first saw an object on the tracks at approximately one quarter of a mile before impact, then Hayes must not have been looking forward or paying attention or he also would have seen the obstruction at that distance.  There is no factual basis in the record for this argument and it is offered up by plaintiff's attorney who has no personal knowledge of the facts in any event.

Plaintiff's counsel also argues that it was negligent of Fulater to wait until 4 to 5 seconds prior to impact with Leone to sound the locomotive horn and bell, but there is no proof that Fulater could have or should have done so sooner.  Further absent from the record is any indication of how or whether activating the warning sooner would have changed the outcome of the accident.  There is simply no evidence before the Court which indicates that either Fulater or Hayes were negligent in any way in causing or contributing to this accident.

Insofar as plaintiff's claims based on the railroad's alleged failure to prevent persons from placing themselves in danger of being struck by a train in the first place, Rekola opined that: 1) "Mr. Leone entered the open railroad right-of-way via a well-worn common access path; " and 2) "Leone who was drunk and prone partially on Track 1 and between the north rails of Track 2" was "near a common access path."  However, Rekola admitted upon being questioned that he did not know the "specific footage distance" from Leone's body on the tracks to the alleged "common access path."  When Rekola said "near" in his report he meant that Leone's body would have been "more than 20 feet" but less than . . . a thousand feet" from the alleged path.  The path in

question "would be the path that led down from GM" and  was the path taken by Leone based on Rekola's review of a valuation map of the area, the police report and his discussions with plaintiff's attorney who clearly has no personal knowledge of the existence or use of a "common access path" in this case.

Rekola said that he based his opinion that a common path existed in the area of the old GM plant on the presence of the "GM switch" on the valuation map.  According to Rekola, "there are always common access paths . . . at a location where there would be a switch."  However, this conclusion was clearly an assumption on Rekola's part since he admitted that he had "not physically seen what's there."  Thus, when Rekola wrote in his report that the "access path is one of several which provide both pedestrian and railroad worker access to the right-of-way and is commonly and regularly used by both the public and railroad workers," he was not alluding to "factual information" provided to him in connection with the lawsuit, but, rather "general" and "past practices" of railroads.  Insofar as his statement  that the access path was "regularly" used by the public and railroad, Rekola acknowledged that he based this opinion solely on "the pool lady's" testimony that Leone had used the alleged "path" prior to the accident.

In fact there is no actual evidence in the record concerning how or where Leone accessed the railroad right-of-way on the night of his death, whether there is a "path" of any kind alongside the tracks, or that Leone or anyone else "regularly" used this route.  Notably, Ms. Lewis testified that Leone told her he was "used to" walking **on** the railroad tracks, not on a path alongside the rails.  The also Court notes that Rekola's reliance on the police report as evidence that Todd Leone walked on a "common access path" behind the old GM plant to reach the scene of the collision is misplaced since nowhere in Detective Fahey's report does he reference or describe a "path" alongside or in the vicinity of the railroad tracks.  Indeed, Detective Fahey merely speculated in his report that it was "conceivable" Todd Leone took a "direct route" from Diamond

Dolls on Townline Road to the GM plant on GM Circle.  Given the absence of any direct or circumstantial evidence such as eyewitness accounts or footprints, etc., concerning Leone's path of travel, however, Fahey's opinion is conclusory.  As such, Rekola has no factual basis to rely on it in formulating his own theory of how or where Leone gained access to the railroad tracks. Finally, even assuming that Leone traveled on some kind of path alongside the railroad tracks, there is no proof or suggestion in the record that defendant CSX knew of or had reason to know of the existence of the path prior to the accident.

Plaintiff's submission of a newspaper article detailing a railway accident that occurred in1991 is not persuasive on the question of whether CSX knew or had reason to know that pedestrians were likely to walk in the railroad right-of-way in the vicinity of the Syracuse China Factory.  The Court first notes that the newspaper article, standing alone, does not constitute admissible evidence of anything insofar as plaintiffs' burden to create a material question of fact. Even if this were not so, the events outlined in the article relate to circumstances that were vastly different than the accident at issue in the present case.  The 1991 accident occurred early in the morning, was not a fatality and involved two teenage boys who "parked their bicycles on the north side of the tracks" and were "playing" along the rails.  There is no mention of or reference to a known "common access path" in the article regarding the accident.  Moreover, the occurrence of two distinctly diverse accidents in roughly the same area of railroad tracks in a twelve year period does not raise a material question of whether CSX had notice that the public "regularly" trespassed in the railroad right-of-way near the Syracuse China Factory.

Rekola also testified that CSX should have erected "No trespassing" signs such as the ones typically installed at grade crossings in the area of the accident to prevent persons from walking in or along the train right-of-way.  However, Rekola admitted that he was unaware of "any scientific study that . . . says no trespassing signs prevent adults from trespassing."  Finally,

Rekola was asked about the opinion in his report that CSX should have installed approximately "[one] mile" of fencing on "both sides of the track" where the collision occurred to prevent persons from entering the railroad right-of-way even though there was no public grade crossing in the area of the accident.  Specifically, Rekola referred to a "6 foot high chain-link fence with intermittent posts and guide wires in accordance with CSXT's standard plans."  Importantly, however, plaintiff has not submitted the alleged internal standards which defendants violated nor does Rekola state how erecting warning signs or fencing would have prevented Todd Leone's accident.

Also absent from plaintiff's submissions is any legal authority for her contention that a railroad has an obligation to erect fences to dissuade human trespassers.  Indeed, it appears that New York's Court of Appeals long ago answered "No" to the question of whether a railroad had a duty to erect fencing in order to prevent a child from wandering onto its tracks and being killed. *See DiCaprio v. N.Y. Cent. R. Co.*, 231 N.Y. 94, 98 (1921).  A court in this District also discussed the issue at length in *Bowen v. Nat'l R.R. Passenger Corp.*:

> Absent a statutory requirement, railroad owners do not have a duty to fence their property to prevent trespassing.  *Munger v. Tonawanda R. Co.*, 4 N.Y. 349 (N.Y. 1850); *McCarthy v. New York, N.H. & H.R. Co.*, 240 F. 602, 605 (2d Cir. 1917).  New York Railroad Law does include statutes that relate to the fencing of railroads.  The first is part of the General Railroad Act of 1850 and relates to farm animals.  N.Y. R.R. Law § 52 requires fencing to "prevent cattle, horses, sheep and hogs from going upon" the tracks. This provision has been construed to apply for the protection of animals only, not humans. *Lefler v. Pennsylvania R. R., Inc.*, 203 Misc. 887, 890, 118 N.Y.S.2d 389 (N.Y.Sup. 1952); *Di Caprio v. New York Central R.R. Co.*, 231 N.Y. 94, 131 N.E. 746 (N.Y. 1921).  The other three statutes were enacted for the protection of people. The commissioner of transportation may require fencing along a railroad's right of way at his or her discretion, in Queen's County, and along tracks that involve an electrified third rail in cities that have more than one million inhabitants. *See* N.Y. R.R. Law § 52- b; N.Y. R.R. Law § 52-c; N.Y. R.R. Law § 52-a (McKinney's 1991).
>
> . . .

> While it is clear that statutes do not constitute "the maximum measure of care demanded," exceeding these policy determinations would require extraordinary circumstances not present in the instant case.

363 F. Supp.2d 370, 378 (N.D.N.Y. 2005).  In the present case, there is no evidence that CSX was required by statute, regulation, administrative order or common law to erect signs in or fence the area where the accident occurred.  Moreover, there is no evidentiary proof in the record which demonstrates that the alleged failure of CSX to erect warning signs or fencing in the area where the collision occurred was the proximate cause of the accident and Leone's ensuing death.

## IV.    CONCLUSION

The Court finds that defendants have submitted *prima facie* proof that they were not negligent in causing or contributing to the accident in this case and that the CSX crew could not have prevented reasonably the collision with Todd Leone under the circumstances which existed at the time of the accident.  In contrast, plaintiff has failed to submit evidence which raises a material question concerning the actions or inactions of defendants or their employees in causing or contributing to the accident.

Based on the foregoing, the Court finds it unnecessary to address defendants' contention that plaintiff is barred from recovery in this case due to Todd Leone's violation of N.Y. R.R. Law § 83.  Whereupon it is hereby

ORDERED that the motion for summary judgment filed by defendants is GRANTED and the complaint is hereby dismissed with prejudice in its entirety.

IT IS SO ORDERED.

Date: March 26, 2008

Norman A. Mordue
Chief United States District Court Judge